UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JEMAR THOMPSON, CRYSTAL COLEMAN, and others,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>C&H SUGAR CO., and others,<br><br>　　　　Defendants. | Case No. 12-cv-00391 NC<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF CRYSTAL COLEMAN**<br><br>Re: Dkt. Nos. 54, 119 |

　　Defendants move for summary judgment as to plaintiff Crystal Coleman's race discrimination claims. The Court must determine: 1) whether Coleman's claims outside the statutes of limitations for Title VII, FEHA, and § 1981 are nonetheless actionable based on a continuing violation or equitable tolling; 2) whether Coleman has pointed to sufficient evidence of discriminatory motivation to support her timely claims; and 3) whether a genuine issue of material fact remains as to whether ASR and C&H are an integrated enterprise. Because the Court answers in the affirmative to all of these questions, summary judgment is denied.

Case No. 12-cv-00391 NC
ORDER DENYING SUMMARY
JUDGMENT AS TO COLEMAN

# BACKGROUND

## A. Procedural Background

On January 25, 2014, thirteen African American employees filed suit against their employer, C&H Sugar Company, Inc., and its parent corporation, American Sugar Refinery, Inc. ("ASR"), alleging that defendants denied them training, pay, and promotions because of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and California Government Code § 12940. Dkt. No. 1. Plaintiffs allege that they were refused promotions and training opportunities to a greater extent than non-African American packaging department employees. *Id.* at 5. Plaintiff Crystal Coleman alleges that she did not receive a promotion for five years and that during her eight years of employment in the packaging department, C&H gave non-African American employees with less seniority more training and promotions than her because of her race. *Id.* at 19.

The parties stipulated to allow defendants to file a separate motion for summary judgment for each plaintiff. Dkt. No. 44. On October 4, 2013, defendants moved for summary judgment on Coleman's race discrimination claims. Dkt. No. 54.

## B. Factual Background

On January 10, 2005, Coleman started working in the packaging department of C&H's sugar refinery in Crockett, California. Dkt. No. 57 at 3-4; Dkt. No. 80-1 at 4. Coleman's entry-level job title was "Laborer (New)." Dkt. No. 57 at 3-4; Dkt. No. 80-1 at 4.

C&H uses "level" designations to classify jobs in the packaging department. Dkt. No. 121-1 at 41; Dkt. No. 121-2 at 30-31. Through training, an entry-level employee, a "Laborer," can get promoted though six levels: Level 1, Level 2, Level 3, Level 4, Level 5, and "Specialist." Dkt. No. 121-1 at 41; Dkt. No. 121-2 at 30-31. Employees working in higher level positions are paid more than employees at lower levels. Dkt. No. 121-1 at 41; Dkt. No. 121-2 at 30-31.

Before 2009, C&H's policy dictated that the packaging department manager would give employees the chance to train for new jobs based on seniority, regardless of discipline

history or attendance record. Dkt. No. 79-1 at 36-37. Employees would progress a level once they trained on two jobs. Dkt. No. 79-1 at 23.

In 2009, C&H and the Sugar Worker's Union negotiated a new collective bargaining agreement ("CBA"), which reclassified packaging department jobs and implemented new promotion procedures. Dkt. No. 121 at 3; Dkt. No. 121-2. Two ASR employees signed the CBA on behalf of C&H. Dkt. No. 56 at 45. When C&H implemented the CBA, Coleman's job was reclassified as a Level 1 position, and Coleman was therefore reclassified from a Laborer to a Level 1 employee on August 10, 2009. Dkt. No. 57 at 4.

Under the CBA, C&H agreed to follow a new procedure for job training and promotion, called the Advancement Program. Dkt. No. 121 at 3; Dkt. No. 121-2. The Advancement Program dictates that C&H will select employees for training and promotion based on seniority, performance rating, and duty status. Dkt. No. 121-2 at 33-36. The new policy required that first, C&H post opportunities to train for higher level positions, and interested employees could add their names to a sign-up sheet. Dkt. No. 79-1 21-22. Then the packaging department manager was to forward the list of candidates to the Human Resources Department. Dkt. No. 79-1 at 21-22. HR was then to review the list of candidates to determine whether a record of disciplinary action or attendance problems disqualified any employees from training. Dkt. No. 79-1 at 21-22. HR was then to revise the list based on employee records and return it to the packaging department manager, who was directed to select qualified employees based on seniority. Dkt. No. 79-1 at 21-22. The packaging department manager also retained discretion to "cross-train" employees on other jobs classified within the same level without regard to seniority, disciplinary record, or attendance. Dkt. No. 79-1 at 36-37.

Under the packaging department's policy, employees with excessive absences would receive bad performance ratings, which would disqualify them from training. Dkt. No. 121-1 at 44, 56. The 2009 CBA incorporated an "Attendance Improvement Program," also known as the "Step Program." Dkt. No. 121-1 at 56. Employees with attendance problems would be placed on Step 1 of the program. *Id.* If they continued to miss work during the

next twelve months, they would be put on Step 2 of the program. *Id.* Step 2 employees who missed another eight hours of work would be terminated. *Id.* However, an employee could be removed from the program and improve his performance record if he had perfect attendance for six months. *Id.* Employees on Step 1 or 2 of the program were to be disqualified from job training under the packaging department's policy. *Id.* at 44, 56.

Coleman cites evidence showing that C&H did not follow these promotion policies in practice, and instead that the training and promotion decision process was actually controlled by a supervisory employee named Cliff Sullivan. When Coleman approached Sullivan in late 2006 or early 2007 to seek training, he told her that he would look into the possibility, but then came back two or three weeks later to tell her that it was not her turn yet because of her attendance problems. Dkt. No. 79-3 at 44. The second time she approached him about training, he told her that she had to wait and walked away. Dkt. No. 79-3 at 43. After being laid off from C&H and then reinstated in 2009, Coleman talked to Sullivan on three occasions to express her concern about other employees being trained ahead of her, but she did not see results. Dkt. No. 79-3 at 46.

Other employees testified in deposition that Sullivan circumvented the seniority rules and excluded African American employees from training. Dkt. No.79-1 at 11-12. One employee testified that Sullivan made racist jokes and once called an African American employee "a nigger" in front of three people. Dkt. No. 79-3 at 15-16 (Mendelowitz Depo., 51:12-13; 52:2-5). When Sullivan saw an African American employee kiss another employee on the cheek, Sullivan referred to her as "a ugly black woman" and commented, "Oh, god, that's gross. How could you kiss something like that?" *Id.* at 16, 35 (Mendelowitz Depo., 52:21-22; 218:10-11).

Several people served as packaging department managers during Coleman's tenure at C&H. Dkt. No. 57 at 4-5. Sullivan was superintendent prior to 2008 and then held the title of manager from spring 2008 to May 2011. Dkt. No. 57 at 4. Timothy Cowger was manager from July 2005 to spring 2008, from spring 2011 to October 2011, and from late 2012 to the present. Dkt. No. 57 at 4-5; Dkt. No. 121 at 2. Two other people were

managers between 2005 and the present. Dkt. No. 57 at 4-5. However, other employees testified that Sullivan made all the decisions in the packaging department, even when Tim Cowger was manager. Dkt. No. 79-3 at 25, 34. Both before and after 2009, Sullivan "ran the plant with an iron fist." Dkt. No. 79-4 at 28 (Snell Depo., 75:8-17). Sullivan disregarded the advancement program and picked who he wanted to train, which mainly did not include African American employees. Dkt. No. 79-4 at 10.

Coleman has not had an exemplary attendance record at C&H. Between 2005 and 2009, C&H gave Coleman four warnings for tardiness and absenteeism, five warnings for clock-out violations, one warning for incorrectly labeling more than seventeen sacks, and four temporary lay-offs for poor attendance and workplace safety violations. Dkt. No. 122 at 5-7. Between 2010 and 2012, C&H warned Coleman on four different occasions about time clock violations and tardiness. In addition, C&H put Coleman on Step 1 of the Attendance Improvement Program on June 20, 2011, for excessive absenteeism over a twelve-month period. Dkt. No. 57 at 7. C&H put Coleman on Step 2 of the program on October 11, 2011, because she missed thirty-two hours of work over a four-month period. Dkt. No. 57 at 8; Dkt. No. 122 at 7-8. After placing Coleman back on Step 1 of the Program, C&H again placed Coleman on Step 2 of the Program because of additional absences. Dkt. No. 122 at 7-8. On May 9, 2012, C&H put Coleman on a Last Chance Agreement, warning her that she would be terminated if she missed another day of work. Dkt. No. 57 at 8; Dkt. No. 122 at 8.

Coleman argues that her disciplinary record cannot explain why C&H denied her training opportunities because C&H gave other, less senior, non-African American employees with disciplinary records opportunities to train. Dkt. No. 82 at 15, 17. For example, Edgardo Adriano, an Asian employee, received training and a promotion even though he was on the Step Program. Dkt. No. 79-2 at 36-37.

Despite Coleman's discipline and attendance record, C&H gave her training and promoted her to Level 2 on July 1, 2011. Dkt. No. 57 at 4. Coleman is currently a Level 2 employee. Dkt. No. 57 at 4.

## LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Ruffin v. Cnty. of L.A.*, 607 F.2d 1276, 1280 (9th Cir. 1979). All reasonable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## DISCUSSION

### A. Coleman's Potentially Time-Barred Claims

The parties dispute whether Coleman can seek damages for discriminatory acts that occurred outside the statute of limitations periods of FEHA, Title VII, and § 1981. Although the parties discuss the statute of limitations issues under FEHA and Title VII simultaneously, the statutes have different standards for showing a continuing violation. The Court therefore discusses each in turn.

#### i.  FEHA Claims

Under the California Fair Employment and Housing Act (FEHA), "[n]o complaint may be filed after the expiration of one year from the date upon which the alleged unlawful

practice or refusal to cooperate occurred." Cal. Gov. Code § 12960(d); *see also Gardner v. City of Berkeley*, 838 F. Supp. 2d 910, 917-18 (N.D. Cal. 2012). Therefore, any discriminatory acts that occurred more than one year prior to the filing of an administrative complaint with the DFEH are time-barred. *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 63 (2000).

A plaintiff may, however, bring a claim for conduct that occurred before the one year period if that conduct amounts to a continuing violation. Whereas Title VII does not allow for continuing violation liability for a series of related acts,[1] a plaintiff may recover under FEHA for a series of related discriminatory acts that occurred outside the statutory period "if (1) the actions are sufficiently similar in kind; (2) they occur with sufficient frequency; and (3) they have not acquired a degree of 'permanence' so that employees are on notice that further efforts at informal conciliation with the employer to obtain accommodation or end harassment would be futile." *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 802 (2001).[2]

Defendants concede that Coleman's denied promotions were sufficiently frequent, but argue that they were not sufficiently similar in kind and that they were permanent such that Coleman cannot establish a continuing violation under *Richards*. The Court finds that genuine disputes of material fact remain as to both similarity and permanence.

Defendants argue that because various HR employees and managers supervised Coleman during the extensive time period when she was denied promotions, the denials are

---

[1] "California courts have relied upon federal interpretations of Title VII to interpret analogous provisions of the California Fair Employment and Housing Act (FEHA)" *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996). However, California law controls interpretations of FEHA where FEHA "evidences a legislative intent different from that of Congress." *Page v. Super. Ct.*, 31 Cal. App. 4th 1206, 1216 (1995).

[2] A plaintiff can recover for acts that occurred during the statutory period even when the plaintiff had prior knowledge of the permanence of those acts if the acts were committed as part of "a systematic, companywide corporate policy of discrimination against a protected class." *Alch v. Super. Ct.*, 122 Cal. App. 4th 339, 369 (2004). However, Coleman here seeks to recover for acts that occurred before the statutory period, so the pattern or practice claim supported by *Alch* is not applicable.

Case No. 12-cv-00391 NC
ORDER DENYING SUMMARY JUDGMENT AS TO COLEMAN
7

not sufficiently similar in kind. But this asks the Court to ignore the facts Coleman presents showing that despite various supervisors having authority on paper, it was Cliff Sullivan who continuously had power over training and promotion decisions in practice. Coleman cites to deposition testimony of supervisor Phillip Mendelowitz who stated that Sullivan "oversaw [the] rules on who was getting the training" and was "the only one who told us who to train." Dkt. No. 79-3 at 5, 10 (Mendelowitz Depo., 37:19-23; 46:19-20). Mendelowitz stated that although training was supposed to be awarded based on seniority, "Cliff circumvented that and picked people he wanted to train and trained them." *Id.* at 11 (47:2-7). Mendelowitz also testified that he was reprimanded by Sullivan for attempting to train African American employees. *Id.* at 13-14. Another employee, Jo Snell, testified that he did not know what Cliff Sullivan's job title was, but he did know that "[a]ny training that was done, Cliff authorized it." Dkt. No. 79-4 at 25-26 (Snell Depo., 26:4-6). This evidence is sufficient to create a triable issue of fact as to whether Sullivan controlled the training and promotions denied to Coleman. The Court therefore cannot rule as a matter of law that the many training and promotion opportunities denied to Coleman were insufficiently similar.

Next, defendants argue that because each denied promotion was a discrete act, the promotions acquired sufficient permanence. This would be correct, had Coleman known or had reason to know that she was denied the promotions based on her race. In assessing the third *Richards* factor, the Court must consider whether acts outside the statutory period had "the degree of permanence which should trigger an employee's awareness of and duty to assert his . . . rights." *Maridon v. Comcast Cable Commc'ns Mgmt.*, LLC, No. 12-cv-02109 EMC, 2013 WL 1786592, at *11 (N.D. Cal. Apr. 25, 2013). The employee's knowledge of discrimination is thus critical, because the permanence factor is premised on the "equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Morgan v. Regents*, 88 Cal. App. 4th at 65.

This Court has found a denial of a promotion to be a "decision [that] was discrete and permanent when made." *Maridon,* 2013 WL 1786592, at *13. But in cases that have

found denials of promotion to have permanence, the plaintiff knew or had reason to know that the decision was made based on their status in a protected class, and thus the denial of a promotion was sufficient to "trigger an employee's awareness of and duty to assert his . . . rights." *Id.* at *11.  For example, in *Maridon*, the plaintiff had reason to know that she was denied a promotion based on her gender more than six years before the limitations period, when a manager told her that he did not promote her because it would "hurt morale to have a woman in that position." *Id.* at *13.  The plaintiff also testified that she had "explicitly considered the possibility of suing for sex discrimination" after additional denied promotions. *Id.*  Later a manager told plaintiff that she "would never be promoted." *Id.*  The Court found that because she had reason to know she was being discriminated against based on gender, each time she was denied a promotion, plaintiff should have been called to action to assert her rights. *Id.*; *see also Zeinali v. Raytheon Co.*, No. 07-cv-01852 MMA CAB, 2011 WL 2580688, at *3 (S.D. Cal. June 29, 2011) (plaintiff "already suspected discriminatory animus" at the time he was denied a promotion); *Burrell v. Cnty. of Santa Clara*, No. 11-cv-04569 LHK, 2013 WL 2156374, at *15 (N.D. Cal. May 17, 2013) (plaintiff "suspected that she was being discriminated against based on her race" for several years before denied promotions).

But here, defendants have pointed to no facts indicating that Coleman knew or should have known that she was being denied promotions based on her race prior to the limitations period.  At her deposition, Coleman testified that she never heard Cliff Sullivan make a racially derogatory remark.  Dkt. No. 55 at 17.  Coleman did testify that she heard from other employees, sometime before a meeting with two HR employees, that Sullivan used the n-word. *Id.* at 34.  But there is no indication in the record of when that meeting took place—or even if it was towards the beginning or end of her employment.  After her reinstatement in 2009, when she continued to be denied training opportunities, Coleman asked David Wilhelm why less senior employees were being trained before her, explaining "I don't know what it is, but . . . a lot of people [are] being trained over me." *Id.* at 31 (Coleman Depo., 86:21-25).  In response to her inquiries, Coleman was repeatedly told she

could achieve training and promotion if she improved her attendance, or waited her turn. *Id.* at 25, 28, 33. Despite a thorough review of the record,[3] the Court finds no indication of when Coleman first had reason to know that Sullivan denied her training due to her race, and that she must therefore enforce her rights. Because of this, the denied training and promotion opportunities cannot be said to have acquired a degree of permanence as to "trigger [Coleman's] awareness of and duty to assert [her] . . . rights" or to put her "on notice that further efforts at informal conciliation with the employer" were futile. *Maridon*, 2013 WL 1786592, at *11; *Richards*, 26 Cal. 4th at 802.

A genuine question of material fact remains as to whether the denied training and promotion opportunities were sufficiently frequent, similar, and had not acquired a degree of permanence that would put Coleman on notice that she must assert her rights. Therefore, the denied training and promotion opportunities may be part of a continuing violation under FEHA and summary judgment is denied as to those opportunities occurring outside the statute of limitations period.

### ii. Title VII and § 1981 Claims

Unlike a claim under FEHA, a plaintiff cannot recover under Title VII or § 1981 for a series of discriminatory acts that occur prior to the statutory period, even when those acts are related to timely discriminatory actions. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Lelaind v. City & Cnty. of S.F.*, 576 F. Supp. 2d 1079, 1093 (N.D. Cal. 2008) (noting that the continuing violation doctrine applies to claims under § 1981 "in the same manner as the doctrine applies to claims pursuant to Title VII"). Under the U.S. Supreme Court's holding in *Morgan*, the continuing violations doctrine "is applicable to Title VII claims of hostile work environment, but not to claims of discrimination or

---

[3] The Court thoroughly reviewed the record, despite defendants' failure to point to evidence of Coleman's knowledge or suspicion of racial discrimination. A district court need not consider evidence in the record "unless it is brought to the district court's attention because the court is not required to comb the record to find some reason to grant or deny summary judgment." *Muench Photography, Inc. v. Pearson Educ., Inc.*, No. 12-cv-01927 WHO, 2013 WL 6185200, at *5 (N.D. Cal. Nov. 19, 2013) (citing *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation marks omitted).

retaliation."[4] *Lelaind*, 576 F. Supp. 2d at 1093.  Discriminatory acts such as "termination, failure to promote, denial of transfer, or refusal to hire are 'discrete acts' that start a new clock for filing administrative charges alleging that act.  Such discrete conduct is not actionable unless it occurs within the statutory time period." *Id.* (quoting *Morgan*, 536 U.S. at 113-14).

But the Supreme Court left open the possibility that the statute of limitations for each discrete act would not run until the employee knows or reasonably should know that the acts were discriminatory. *Morgan*, 536 U.S. at 115, n.7 (declining to decide "whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered" because employee at issue "believed that he was being discriminated against at the time that all of these acts occurred.").  The Ninth Circuit has determined that the statute of limitations begins to accrue in Title VII cases when the plaintiff "knew [he] had been injured and by whom, even if at that point in time the plaintiff[] did not know of the legal injury, i.e., that there was an allegedly discriminatory motive underlying" the discriminatory act. *Lukovsky v. City & Cnty. of S.F.*, 535 F.3d 1044, 1051 (9th Cir. 2008). The Court noted, however, that the issue of accrual is separate from the issue of equitable tolling, and expressly left open the possibility that equitable tolling applies when "a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period." *Id.*; *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) ("we have held that the statutory time limits applicable to lawsuits against private employers under Title VII are subject to equitable tolling").

Several courts have tolled the statute of limitations for an employment discrimination claim when the plaintiff could not have known that the employer's adverse decision was based on discriminatory intent. *Pronechen v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 06-cv-01726 LEW, 2010 WL 1239318, at *2 (E.D. Cal. Mar. 25, 2010) (denying summary

---

[4] The Supreme Court also expressly declined to address whether a pattern or practice claim could survive under a continuing violation theory. *Morgan*, 536 U.S. at 115 n.9.  Because Coleman has not alleged or pointed to evidence showing a pattern or practice violation of Title VII, the Court need not address this uncertainty.

Case No. 12-cv-00391 NC
ORDER DENYING SUMMARY
JUDGMENT AS TO COLEMAN

11

1  judgment on equitable tolling issue where "for all seven positions, a material issue of fact
2  exists, as to whether Plaintiff had notice of the possibility of the alleged age
3  discrimination."); *Sterrett v. Mabus*, No. 11-cv-01899 W NLS, 2013 WL 593752, at *5
4  (S.D. Cal. Feb. 15, 2013) (finding no continuing violation under Title VII but tolling the
5  statute for discrete acts that occurred before the employee "realize[d] the employment
6  decision was the result of gender discrimination."); *see also Horita v. Kauai Island Util.*
7  *Co-op*, 352 F. App'x 194, 195 (9th Cir. 2009) (noting plaintiff could have raised equitable
8  tolling to toll the statute of limitations for her Title VII claim to the date "when Plaintiff
9  claims she first learned of discriminatory intent (and thus of her claim)").

10  It may be that Coleman suspected race discrimination long before each denied
11  training and promotion opportunity, or that she should have suspected as much. But the
12  burden is upon defendants to point to evidence in the record demonstrating Coleman's
13  notice of possible discrimination, and they have failed to do so. As discussed above, there
14  is other evidence in the record that Coleman did not understand why she was denied
15  training and that she was told her attendance record was the sole reason to blame. The
16  Court cannot speculate or make inferences against Coleman at the summary judgment stage,
17  and therefore a genuine issue of material fact remains as to when Coleman knew or should
18  have known that each denied promotion was a result of racial discrimination by Sullivan
19  and C&H.

20  Therefore, the denied training and promotions opportunities, though not part of a
21  continuing violation under Title VII or § 1981, are nonetheless actionable because their
22  statutes of limitations are equitably tolled. Coleman had 300 days to file a discrimination
23  charge from the time she first knew or should have known that she may have been denied a
24  training or promotion opportunity based on race. *See* 42 U.S.C. § 2000e-5; *Roberds v.*
25  *Cnty. of Coconino*, 447 F. App'x 839 (9th Cir. 2011) (charge of discrimination filed with
26  state agency must be filed within 300 days after the alleged unlawful employment practice).
27  Coleman had two years to file a complaint pursuant to § 1981 from the time she first knew
28  or should have known about C&H's alleged discrimination. *See Lelaind,* 576 F. Supp. 2d at

1092 (statute of limitations begins two years prior to filing of civil complaint for § 1981 claim).

**B.     Coleman's Timely Claims**

   **i.     FEHA and Title VII Discrimination Claims**

Both FEHA and Title VII prohibit employment discrimination on the basis of specified statuses, including race and national origin. Cal. Gov't Code § 12940(a); 42 U.S.C. § 2000e. "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying [its] own statutes." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000).

To survive summary judgment, a plaintiff may either "proceed by using the *McDonnell Douglas* framework,[5] or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998). "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.*; *see also Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991) ("the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact.").

Coleman has produced substantial direct evidence of discriminatory animus on the part of a supervisory employee at C&H, Cliff Sullivan. One former employee of C&H,

---

[5] When a plaintiff presents indirect proof of racial discrimination, Courts apply the burden shifting test established in *McDonnell Douglas*. Under that analysis, the plaintiff bears the burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff succeeds, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer demonstrates a nondiscriminatory reason, the employee must then present evidence that the reason was pretextual. *Id.*

Case No. 12-cv-00391 NC
ORDER DENYING SUMMARY
JUDGMENT AS TO COLEMAN
13

Phillip Mendelowitz, testified that he heard Cliff Sullivan call one of the African American employees "a nigger." Dkt. No. 79-3 at 13 (Mendelowitz Depo., 51:12-13; 52:2-5). Mendelowitz also stated that Sullivan told him "point-blank to stop it" after Mendelowitz had attempted to train several African American employees. *Id.* at 13-14. He also testified that Sullivan referred to Coleman as "a ugly black woman." *Id.* at 35.

This Court has "repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry*, 424 F.3d at 1039; *see also Cordova*, 124 F.3d at 1150 (direct evidence of race discrimination where employer referred to a Mexican American employee other than the plaintiff as a "dumb Mexican."); *Lindahl*, 930 F.2d at 1438 (direct evidence of sexual stereotyping where employer believed that the female candidates get "nervous" and "easily upset"); *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991) (direct evidence of sex stereotyping where employee referred to female plaintiff as "an old warhorse" and to her students as "little old ladies"). The direct evidence of discrimination provided by Coleman is just as strong as the evidence in these cases, if not stronger, and is sufficient to create a triable issue of fact as to Coleman's claims for discrimination based on race. Because this evidence alone is sufficient to preclude summary judgment, the Court need not engage in the *McDonnell Douglas* burden shifting analysis.[6]

### ii.   Section 1981 Claims

Section 1981 of the Civil Rights Act provides that every person in the United States "shall have the same right in every State and Territory to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). "The term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." This Court has thus found that § 1981 protects not only "the initiation of the employment relationship

---

[6] This precedent is logical, as no amount of evidence of a legitimate nondiscriminatory motivation would be sufficient to eliminate the dispute of material fact created by direct evidence of the employer's discrimination.

Case No. 12-cv-00391 NC
ORDER DENYING SUMMARY
JUDGMENT AS TO COLEMAN

14

but also subsequent modifications during the course of the employment relationship such as promotion." *Lukovsky*, 2006 WL 436142, at *3.

In determining whether an employer's act is a violation of § 1981, courts apply "the same legal principles as those applicable in a Title VII disparate treatment case." *Metoyer*, 504 F.3d at 930. Because the Court finds that Coleman has presented evidence such to create a genuine issue of material fact as to her race discrimination claims, her § 1981 claim also survives summary judgment.

### iii. Failure to Prevent Discrimination Claims

It is an unlawful employment practice under FEHA "for an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace. Cal. Govt. Code § 12940(k). A plaintiff seeking to recover damages based on a claim of failure to prevent discrimination or harassment "must show three essential elements: 1) plaintiff was subjected to discrimination, harassment or retaliation; 2) defendant failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and 3) this failure caused plaintiff to suffer injury, damage, loss or harm." *Lelaind*, 576 F. Supp. 2d at 1103.

In moving for summary judgment on Coleman's failure to prevent discrimination claim, defendants rely solely on the argument that there can be no liability for a failure to prevent discrimination claim where the underlying FEHA discrimination claim is dismissed. *See Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 288-89 (1998). Because the Court finds that Coleman's FEHA claims survive, summary judgment is also denied as to her failure to prevent discrimination claims. *See Guitron v. Wells Fargo Bank, N.A.*, No. 10-cv-03461 CW, 2012 WL 2708517 (N.D. Cal. July 6, 2012) (denying motion for summary judgment as to failure to prevent age discrimination claim, where underlying age discrimination claim survived summary judgment).

## C. ASR as a Defendant

Last, defendants move for summary judgment on all claims as to defendant ASR,

arguing that ASR is not liable to Coleman because it did not employ her. Coleman argues that there is a dispute of material fact as to whether ASR and C&H may both be liable under an integrated enterprise theory. The Court agrees with Coleman.

When a parent and subsidiary operate as an "integrated enterprise," the parent may be held liable for discrimination by its subsidiary. *See Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211, 1214 (9th Cir. 1989); *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 815 (9th Cir. 2002). Under the "integrated enterprise" test, separate business entities may be treated as a single employer after weighing four factors: 1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control. *Kang*, 296 F.3d at 815; *Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 737-38 (1998). None of these factors are dispositive, and all four need not be met in each case. *NLRB v. Triumph Curing Ctr.*, 571 F.2d 462, 468 (9th Cir. 1978). "The critical question is, [w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Laird*, 68 Cal. App. 4th at 80.

Although a close call, considering the facts in the light most favorable to plaintiff, the Court finds that Coleman has shown a dispute of material fact as to whether parent corporation, ASR, can be held liable for discrimination committed by its subsidiary, C&H. To show that ASR controlled employment matters affecting Coleman, she cites to evidence that in 2006 and 2009, ASR employees signed collective bargaining agreements on behalf of C&H. Dkt. No. 56 at 45; Dkt. No. 56-3 at 64; Dkt. No. 79-1 at 24-25. These same collective bargaining agreements contained the terms of the promotion policy that is at dispute in this lawsuit, which Coleman claims was applied in a discriminatory fashion.[7]

Additionally, Coleman provided evidence that the ASR Legal Department supports C&H's HR Department and supervises its handling of race discrimination complaints

---

[7] The Court recognizes that Coleman may be arguing two irreconcilable positions: that Cliff Sullivan wholly controlled training and promotion programs at C&H, and that the CBA, signed by ASR, controlled the training and promotion program at C&H. At this stage, there is a question of material fact as to whether the policy was applied according to the CBA or if Cliff Sullivan in practice controlled these employment decisions. Coleman must wrestle with this inconsistency at trial.

because C&H has no legal department employees. Dkt. No. 79-2 at 22. HR employee Jill Nohl testified that if a discrimination complaint was received through the employee ethics hotline, an ASR employee would decide who at ASR should investigate the complaint. *Id.* at 24-25. Nohl also testified that she would review DFEH complaints and then forward the documentation to ASR Legal. *Id.* at 23.

Coleman alleges she experienced discrimination at C&H, and these processes therefore affected her employment and are directly related to her claims. Because Coleman has provided evidence that ASR controlled the collective bargaining agreement and handled discrimination complaints, which were employment matters affecting Coleman, a question of material fact remains as to whether ASR and C&H are an integrated enterprise. Summary judgment on this issue is therefore denied.

## CONCLUSION

For the reasons explained, defendants' motion for summary judgment as to plaintiff Crystal Coleman is denied.

IT IS SO ORDERED.

Date: March 24, 2014

_____
Nathanael M. Cousins
United States Magistrate Judge