1

2

3

4

5

6

7

8

9 **UNITED STATES DISTRICT COURT**

10 **NORTHERN DISTRICT OF CALIFORNIA**

11 **SAN FRANCISCO DIVISION**

12

| | |
|---|---|
| JEMAR THOMPSON, ROSEMARY JOHNSON, EARL HOLLY, DAMIAN WEST, RAY STRONG, KEVIN HARDY, IRVIN GREEN, JO'SEAN SNELL, WARREN ANDERSON and CRYSTAL COLEMAN, | Case No. 12-cv-00391 NC<br><br>**AMENDED ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 129 |
| Plaintiffs, | |
| v. | |
| C&H SUGAR CO., and AMERICAN SUGAR REFINERY, INC., | |
| Defendants. | |

21

22        Defendants move for summary judgment as to nine plaintiffs' race discrimination

23 claims.  The Court previously denied defendants' motion for summary judgment as to race

24 discrimination claims brought by plaintiff Crystal Coleman.  Defendants therefore bring this

25 motion for summary judgment as to the remaining plaintiffs: Jemar Thompson, Rosemary

26 Johnson, Earl Holly, Damian West, Ray Strong, Kevin Hardy, Irvin Green, Jo'Sean Snell

27 and Warren Anderson.  The Court must determine: 1) whether plaintiffs' claims outside the

28 statutes of limitations for Title VII, FEHA, and § 1981 are nonetheless actionable based on

1    a continuing violation or equitable tolling; 2) whether plaintiffs have pointed to sufficient

2    evidence of discriminatory motivation to support their timely claims; and 3) whether

3    plaintiffs' claims fail because their alleged damages are too speculative or uncertain.  The

4    Court finds that claims outside the statutes of limitations are barred for the remaining

5    plaintiffs except for plaintiff Thompson.  But the Court finds that plaintiffs have pointed to

6    sufficient evidence of discriminatory intent to support their timely claims.  The Court also

7    finds that plaintiffs' damages are not so speculative as to merit summary judgment.  The

8    motion for summary judgment is therefore granted in part and denied in part.

9                                        **BACKGROUND**

10   **A.   Procedural Background**

11          On January 25, 2012, thirteen African American employees filed suit against their

12   employer, C&H Sugar Company, Inc., and its parent corporation, American Sugar Refinery,

13   Inc. ("ASR"), alleging that defendants denied them training and promotions within the

14   packaging department because of their race in violation of Title VII of the Civil Rights Act

15   of 1964, 42 U.S.C. § 1981, and California Government Code § 12940.  Dkt. No. 1.

16   Plaintiffs allege that they were refused promotions and training opportunities to a greater

17   extent than non-African American packaging department employees.  *Id.* at 5.  Prior to

18   filing suit, plaintiffs Jemar Thompson, Rosemary Johnson, Earl Holly, Damian West, Ray

19   Strong, Kevin Hardy, Crystal Coleman, and Irvin Green filed complaints on July 25, 2011

20   with the California Department of Fair Employment and Housing ("DFEH") charging the

21   same alleged discrimination.  Dkt. No. 1 at ¶¶ 27, 36, 59, 68, 80, 91, 120, 128.  Plaintiffs

22   Snell and Anderson filed their DFEH complaints on October 7, 2011.  Dkt. No. 1 at ¶¶ 136,

23   144.

24          The parties stipulated to allow defendants to file a separate motion for summary

25   judgment for each plaintiff.  Dkt. No. 44.  On October 4, 2013, defendants moved for

26   summary judgment on Crystal Coleman's race discrimination claims.  Dkt. No. 54.  The

27   Court denied the motion.  Dkt. No. 138.  Defendants bring this motion for summary

28

1   judgment as to the remaining nine plaintiffs.[1]

2   The parties consented to the jurisdiction of a magistrate judge.  Dkt. Nos. 5, 15.

3   **B.   General Factual Background**

4   C&H uses "level" designations to classify jobs in the packaging department.  Dkt.

5   No. 121-1 at 41; Dkt. No. 121-2 at 30-31.  An entry-level employee at C&H is called a

6   Laborer (New).  Dkt. No. 121 at ¶14.  After one year of service, those employees are

7   automatically elevated to Laborers.  *Id.*  Through training, a Laborer can get promoted

8   though six levels: Level 1, Level 2, Level 3, Level 4, Level 5, and "Specialist."  Dkt. No.

9   121-1 at 41; Dkt. No. 121-2 at 30-31.  Employees working in higher level positions are paid

10  more than employees at lower levels.  Dkt. No. 121-1 at 41; Dkt. No. 121-2 at 30-31.

11  Before 2009, C&H's policy dictated that the packaging department manager would

12  give employees the chance to train for new jobs based on seniority, regardless of discipline

13  history or attendance record.  Dkt. No. 79-1 at 36-37.  Employees would progress a level

14  once they trained on two jobs.  Dkt. No. 79-1 at 23.

15  In 2009, C&H and the Sugar Worker's Union negotiated a new collective bargaining

16  agreement ("CBA"), which reclassified packaging department jobs and implemented new

17  promotion procedures.  Dkt. No. 121 at 3; Dkt. No. 121-2.  Two ASR employees signed the

18  CBA on behalf of C&H.  Dkt. No. 56 at 45.

19  Under the CBA, C&H agreed to follow a new procedure for job training and

20  promotion, called the Advancement Program.  Dkt. No. 121 at 3; Dkt. No. 121-2.  The

21  Advancement Program dictated that C&H select employees for training and promotion

22  based on seniority, performance rating, and duty status.  Dkt. No. 121-2 at 33-36.  The new

23  policy required that first, C&H post opportunities to train for higher level positions, and

24  interested employees could add their names to a sign-up sheet.  Dkt. No. 79-1 21-22.  Then

25  the packaging department manager was to forward the list of candidates to the Human

26  Resources Department.  Dkt. No. 79-1 at 21-22.  HR was then to review the list of

27

28  _____

[1] Three original plaintiffs voluntary dismissed their claims earlier in the litigation. Dkt. Nos. 48, 78.

candidates to determine whether a record of disciplinary action or attendance problems disqualified any employees from training.  Dkt. No. 79-1 at 21-22.  HR was then to revise the list based on employee records and return it to the packaging department manager, who was directed to select qualified employees based on seniority.  Dkt. No. 79-1 at 21-22.  The packaging department manager also retained discretion to "cross-train" employees on other jobs classified within the same level without regard to seniority, disciplinary record, or attendance.  Dkt. No. 79-1 at 36-37.

Under the packaging department's policy, employees with excessive absences would receive bad performance ratings, which would disqualify them from training.  Dkt. No. 121-1 at 44, 56.  The 2009 CBA incorporated an "Attendance Improvement Program," also known as the "Step Program."  Dkt. No. 121-1 at 56.  Employees with attendance problems would be placed on Step 1 of the program.  *Id.*  If they continued to miss work during the next twelve months, they would be put on Step 2 of the program.  *Id.*  Step 2 employees who missed another eight hours of work would be terminated.  *Id.*  However, an employee could be removed from the program and improve his performance record if he had perfect attendance for six months.  *Id.*  Employees on Step 1 or 2 of the program were to be disqualified from job training under the packaging department's policy.  *Id.* at 44, 56.

Plaintiffs cite evidence showing that C&H did not follow these promotion policies in practice, and instead that the training and promotion decision process was actually controlled by a supervisory employee named Cliff Sullivan.  Other employees testified in depositions that Sullivan circumvented the seniority rules and excluded African American employees from training.  Dkt. No.79-1 at 11-12.  Supervisory employee Phil Mendelowitz testified that in 2005, Sullivan made racist jokes and once called an African American employee "a nigger" in front of three people.  Dkt. No. 164 at 109-110 (Mendelowitz Depo., 142:15-143:7).  Mendelowitz also testified that when Sullivan saw an African American employee kiss another African American employee on the cheek, Sullivan referred to her as "a ugly black woman" and commented, "Oh, god, that's gross.  How could you kiss something like that?"  Dkt. No. 79-3 at 16, 35 (Mendelowitz Depo., 52:21-

22; 218:10-11).  Mendelowitz's employment at C&H ended in March 2007.  Dkt. No. 164 at 112 (Mendelowitz Depo., 229:9-13).  Cliff Sullivan's employment at C&H ended in the spring of 2011.  Dkt. No. 131 at ¶ 2.  Sullivan passed away in July 2013.  Dkt. No. 129 at 14.

Several people served as packaging department managers during plaintiffs' tenure at C&H.  Dkt. No. 57 at 4-5.  Sullivan was superintendent prior to 2008 and then held the title of manager from spring 2008 to May 2011.  Dkt. No. 57 at 4.  Timothy Cowger was manager from July 2005 to spring 2008, from spring 2011 to October 2011, and from late 2012 to the present.  Dkt. No. 57 at 4-5; Dkt. No. 121 at 2.  Two other people were managers between 2005 and the present.  Dkt. No. 57 at 4-5.  However, other employees testified that Sullivan made all the decisions in the packaging department, even when Tim Cowger was manager.  Dkt. No. 79-3 at 25, 34.  Both before and after 2009, Sullivan "ran the plant with an iron fist."  Dkt. No. 79-4 at 28 (Snell Depo., 75:8-17).  Sullivan disregarded the advancement program and picked who he wanted to train, which mainly did not include African American employees.  Dkt. No. 79-4 at 10 (Johnson Depo, 100:3-8).

**C.    Factual Background Specific to the Nine Remaining Plaintiffs**

      **i.    Jemar Thompson**

Jemar Thompson began working in the packaging department on December 8, 2002.  Dkt. No. 132 at ¶ 10.  Thompson was elevated from Laborer (New) to Laborer after one year of service at C&H.  *Id.*  Thompson was promoted to Level 1 on September 29, 2004.  Thompson was promoted to Level 2 on January 29, 2005.  *Id.*  Thompson was promoted to Level 3 on November 14, 2011.  *Id.*

Thompson claims that he spoke with HR manager David Wilhelm, a union representative, and Cliff Sullivan to inquire why he was not being trained.  Dkt. No. 158 at 12-13, 14, 15 (Thompson Depo., 83:24-84:4; 92:9-20; 94:17-95:3).  In October 2010, Thompson called a hotline to complain about unfair training.  *Id.* at 103:4-10.  Thompson alleges that after his 2005 promotion, he was wrongfully denied promotions until six years later when Sullivan no longer controlled the packaging department.  *Id.* at 161:7-18.

### ii.   Damian West

Damian West began working in the packaging department on August 21, 2002.  Dkt. No. 132 at ¶ 22.  After a year of service, West was elevated from Laborer (New) to Laborer. *Id.*  West was promoted to Level 1 on March 1, 2004.  *Id.*  West was promoted to Level 2 on November 13, 2004.  *Id.*  West was promoted to Level 3 on November 14, 2011.  *Id.*

West claims that he spoke to HR manager Wilhelm in March 2011 to complain that African Americans were being denied training and promotion opportunities.  Dkt. No. 158 at 26 (West Depo., 132:9-25).  West also complained to plant manager Kim Merritt about being passed over for training opportunities.  *Id.* at 150:13-21.  West alleges nothing was done as a result of his complaints.  *Id.*

In 2009, Cliff Sullivan disciplined West for tardiness, despite West protesting that he was not tardy and was actually changing shifts.  Dkt. No. 164 at 67 (West Depo., 72:2-7).  West recounted that some time before 2008, he witnessed Cliff Sullivan unfairly discipline an African American employee.  *Id.* at 49:24-53:22.  West also testified that he witnessed Sullivan refuse to speak to African American employees and that from the time West was hired, Sullivan was friendly with non-African American employees and unfriendly toward African American employees.  *Id.* at 35:4-25; 85:8-86:2.  West also claimed that in 2005 or 2006, in his role as shop steward, West represented African American workers with grievances about discipline and that Sullivan refused to investigate those grievances.  *Id.* at 90:9-91:4.

### iii.   Irvin Green

Irvin Green began working in the packaging department on December 9, 2002.  Dkt. No. 132 at ¶ 34.  After a year of service, Green was elevated from Laborer (New) to Laborer.  *Id.*  Green was promoted to Level 1 on August 4, 2004.  *Id.*  Green was elevated to Level 2 on August 10, 2009.  *Id.*  Green was promoted to Level 3 on December 3, 2013.  *Id.*

Green claims that he spoke to Cliff Sullivan more than ten times between 2005 and 2010 regarding training, but was consistently told he would be trained eventually or was given no response.  Dkt. No. 158 at 38-40 (Green Depo., 85:23-87:19).  At some point,

Green also spoke with Tim Cowger to inquire about a lack of training, but without any result. *Id.* at 111:19-112:6.

Green once complained to union business agent Ross Lawrence, sometime between 2004 and 2008, that he was being discriminated against on the basis of race. Dkt. No. 164 at 42 (Green Depo., 91:1-25).

### iv. Warren Anderson

Warren Anderson began working in the packaging department on March 26, 2003. Dkt. No. 132 at ¶ 42. After a year of service, Anderson was elevated from Laborer (New) to Laborer. *Id.* Anderson was promoted to Level 1 on March 15, 2006. *Id.* Anderson was elevated to Level 2 on August 10, 2009. *Id.*

Anderson in his deposition stated that Cliff Sullivan treated blacks like they were not human. Dkt. No. 164 at 6 (Anderson Depo., 24:24). Anderson said he witnessed this behavior sometime around 2005. *Id.* at 26:3-6. In 2008, another employee told Anderson that Phil Mendelowitz heard Cliff Sullivan use the "n word" in the office. *Id.* at 41:8-15.

### v. Earl Holly

Earl Holly began working in the packaging department on August 2, 2004. Dkt. No. 132 at ¶ 19. After a year of service, Holly was elevated from Laborer (New) to Laborer. *Id.* Holly was promoted to Level 1 on June 24, 2007. *Id.* Holly was promoted to Level 2 on July 8, 2011. *Id.* Holly was promoted to Level 3 on May 28, 2012. *Id.*

Holly called a hotline to complain about being overlooked for promotions in 2010 or 2011. Dkt. No. 158 at 17-18 (Holly Depo., 80:16-81:5). At some point, Holly complained to Kyle Stradleigh in HR, but was told that "whatever [Sullivan] says goes." *Id.* at 29:12-24.

Holly testified that Sullivan, five to six years ago, used to look at Holly like he did not exist. Dkt. No. 164 at 18 (Holly Depo., 26:7-27:3).

### vi. Rosemary Johnson

Rosemary Johnson began working in the packaging department on August 11, 2004. Dkt. No. 132 at ¶ 16. After a year of service, Johnson was elevated from Laborer (New) to

Laborer.  *Id.*  Johnson was promoted to Level 1 on March 12, 2006.  *Id.*  Johnson was elevated to Level 2 on August 10, 2009.  *Id.*  Johnson was promoted to Level 3 on September 23, 2012.  *Id.*

Johnson twice inquired as to how she could get promoted, and was told that as long as she was not late and was not on a Step program, she had a chance to move up.  Dkt. No. 158 at 29 (Johnson Depo., 63:20-25).

Johnson testified that while she was working, she learned from Phil Mendelowitz that Cliff Sullivan had used "the n word" at the office.  Dkt. No. 164 at 32-33 (Johnson Depo., 165:15-166:5).

### vii.   Ray Strong

Ray Strong began working in the packaging department on September 27, 2004.  Dkt. No. 132 at ¶ 27.  After a year of service, Strong was elevated from Laborer (New) to Laborer.  *Id.*  Strong was promoted to Level 1 on June 23, 2006.  *Id.*  Strong transferred to the Quality Department sometime between July and September of 2010.  *Id.*

Strong spoke with Ross Lawrence in the union to inquire about trainings and promotions.  Dkt. No. 159 at 8 (Strong Depo., 147:15-148:6).  Lawrence said he had a meeting with Sullivan and reported that there would be no upcoming trainings.  *Id.*

Strong spoke with an attorney in 2006 regarding racial discrimination by Cliff Sullivan.  Dkt. No. 164 at 77-78 (Strong Depo., 9:6-10:23).

### viii.   Jo'Sean Snell

Jo'Sean Snell began working in the packaging department on August 11, 2004.  Dkt. No. 132 at ¶ 38.  After a year of service, Snell was elevated from Laborer (New) to Laborer. *Id.*  Snell was promoted to Level 1 on August 28, 2006.  *Id.*  Snell was elevated to Level 2 on August 10, 2009.  *Id.*  Snell was promoted to Level 3 on December 3, 2013.  *Id.*

Snell testified that while he was working, he learned from Phil Mendelowitz that Cliff Sullivan had used "the n word" at the office.  Dkt. No. 164 at 89 (Snell Depo., 93:5-8).

### ix.   Kevin Hardy

Kevin Hardy began working in the packaging department on May 27, 2008.  Dkt. No.

132 at ¶ 31.  After a year of service, Hardy was elevated from Laborer (New) to Laborer. *Id.*  Hardy was elevated to Level 1 on August 10, 2009.  *Id.*  Hardy transferred to the Quality Department in 2010, and was promoted to Level 2 upon his transfer.  *Id.*

Hardy testified that Cliff Sullivan told him during his interview that he may be qualified for a Level 5 position, but Hardy was later never permitted to test for the Level 5 position.  Dkt. No. 159 at 32-33 (Hardy Depo., 50:10-15; 52:7-21).  Hardy accepted an entry-level position as a Laborer (new) because it was immediately available.  *Id.* at 66:13-18.  But Hardy inquired with Cliff Sullivan every few months to see if he could test for the Level 5 position, but was never permitted to test.  *Id*. at 82:12-84:14.  According to Hardy, Sullivan made it sound like testing for the Level 5 position remained a possibility.  *Id.* at 84:12-24.  Sometime thereafter, Hardy became aware that a non-African American employee got the Level 5 position.  Dkt. No. 164 at 47 (Hardy Depo., 74:4-20).  Hardy testified that he began experiencing symptoms of emotional distress since 2008 because he felt he got "passed up" for the position on the basis of his race.  *Id.* at 218:3-219:7.

## LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Bald assertions that genuine issues of material fact exist are insufficient.  *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth

1  specific facts showing that a genuine issue of fact exists for trial.  Fed. R. Civ. P. 56(c);

2  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).  All

3  reasonable inferences, however, must be drawn in the light most favorable to the

4  nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

5  **DISCUSSION**

6  **A.    Plaintiffs' Potentially Time-Barred Claims**

7  The parties dispute whether plaintiffs can seek damages for discriminatory acts that

8  occurred outside the statute of limitations periods of FEHA (one year), Title VII (300 days),

9  and § 1981 (two years).

10  **i.    FEHA Claims**

11  Under the California Fair Employment and Housing Act (FEHA), "[n]o complaint

12  may be filed after the expiration of one year from the date upon which the alleged unlawful

13  practice or refusal to cooperate occurred."  Cal. Gov. Code § 12960(d); *see also Gardner v.*

14  *City of Berkeley*, 838 F. Supp. 2d 910, 917-18 (N.D. Cal. 2012).  Therefore, any

15  discriminatory acts that occurred more than one year prior to the filing of an administrative

16  complaint with the DFEH are time-barred.  *Morgan v. Regents of Univ. of Cal.*, 88 Cal.

17  App. 4th 52, 63 (2000).

18  A plaintiff may, however, bring a claim for conduct that occurred before the one year

19  period if that conduct amounts to a continuing violation.  Whereas Title VII does not allow

20  for continuing violation liability for a series of related acts,[2] a plaintiff may recover under

21  FEHA for a series of related discriminatory acts that occurred outside the statutory period

22  "if (1) the actions are sufficiently similar in kind; (2) they occur with sufficient frequency;

23  and (3) they have not acquired a degree of 'permanence' so that employees are on notice

24  that further efforts at informal conciliation with the employer to obtain accommodation or

25

26  [2] "California courts have relied upon federal interpretations of Title VII to interpret analogous provisions of the California Fair Employment and Housing Act (FEHA)" *Bradley v. Harcourt,*

27  *Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).  However, California law controls interpretations of FEHA where FEHA "evidences a legislative intent different from that of Congress."  *Page v.*

28  *Super. Ct.*, 31 Cal. App. 4th 1206, 1216 (1995).

end harassment would be futile." *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 802 (2001).[3]

Defendants concede that plaintiffs' denied promotions were sufficiently frequent, but argue that they were not sufficiently similar in kind and that they were permanent such that plaintiffs cannot establish a continuing violation under *Richards*.  The Court finds that genuine disputes of material fact remain as to similarity.  Genuine disputes of material fact remain as to permanence for plaintiff Thompson's claims.

### a) Similarity

Defendants argue that because various HR employees and managers supervised plaintiffs during the extensive time period when they were denied promotions, the denials are not sufficiently similar in kind.  But this asks the Court to ignore the facts that plaintiffs present showing that despite various supervisors having authority on paper, it was Cliff Sullivan who continuously had power over training and promotion decisions in practice.  Plaintiffs cite to deposition testimony of supervisor Phil Mendelowitz who stated that Sullivan "oversaw [the] rules on who was getting the training" and was "the only one who told us who to train."  Dkt. No. 79-3 at 5, 10 (Mendelowitz Depo., 37:19-23; 46:19-20).  Mendelowitz stated that although training was supposed to be awarded based on seniority, "Cliff circumvented that and picked people he wanted to train and trained them."  *Id.* at 11 (47:2-7).  Mendelowitz also testified that he was reprimanded by Sullivan for attempting to train African American employees.  *Id.* at 13-14.  Another employee, Jo'Sean Snell, testified that he did not know what Cliff Sullivan's job title was, but he did know that "[a]ny training that was done, Cliff authorized it."  Dkt. No. 79-4 at 25-26 (Snell Depo., 26:4-6).  This evidence is sufficient to create a triable issue of fact as to whether Sullivan

---

[3] A plaintiff can recover for acts that occurred during the statutory period even when the plaintiff had prior knowledge of the permanence of those acts, if the acts were committed as part of "a systematic, companywide corporate policy of discrimination against a protected class." *Alch v. Super. Ct.*, 122 Cal. App. 4th 339, 369 (2004).  However, plaintiffs here seek to recover for acts that occurred before the statutory period, so the pattern or practice claim supported by *Alch* is not applicable.

controlled the training and promotions denied to plaintiffs.  The Court therefore cannot rule as a matter of law that the many training and promotion opportunities denied to plaintiffs were insufficiently similar.

### b)  Permanence

Next, defendants argue that because each denied promotion was a discrete act, the promotions acquired sufficient permanence.  This would be correct, had each plaintiff known or had reason to know that he or she was denied the promotions based on race.  In assessing the third *Richards* factor, the Court must consider whether acts outside the statutory period had "the degree of permanence which should trigger an employee's awareness of and duty to assert his . . . rights."  *Maridon v. Comcast Cable Commc'ns Mgmt.*, LLC, No. 12-cv-02109 EMC, 2013 WL 1786592, at *11 (N.D. Cal. Apr. 25, 2013).  The employee's knowledge of discrimination is thus critical, because the permanence factor is premised on the "equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated."  *Morgan v. Regents*, 88 Cal. App. 4th at 65.

This Court has found a denial of a promotion to be a "decision [that] was discrete and permanent when made."  *Maridon,* 2013 WL 1786592, at *13.  But in cases that have found denials of promotion to have permanence, the plaintiff knew or had reason to know that the decision was made based on their status in a protected class, and thus the denial of a promotion was sufficient to "trigger an employee's awareness of and duty to assert his . . . rights."  *Id.* at *11.  For example, in *Maridon*, the plaintiff had reason to know that she was denied a promotion based on her gender more than six years before the limitations period, when a manager told her that he did not promote her because it would "hurt morale to have a woman in that position."  *Id.* at *13.  The plaintiff also testified that she had "explicitly considered the possibility of suing for sex discrimination" after additional denied promotions.  *Id.*  Later a manager told plaintiff that she "would never be promoted."  *Id.*  The Court found that because she had reason to know she was being discriminated against based on gender, each time she was denied a promotion, plaintiff should have been called to

action to assert her rights.  *Id.*; *see also Zeinali v. Raytheon Co.*, No. 07-cv-01852 MMA CAB, 2011 WL 2580688, at *3 (S.D. Cal. June 29, 2011) (plaintiff "already suspected discriminatory animus" at the time he was denied a promotion); *Burrell v. Cnty. of Santa Clara*, No. 11-cv-04569 LHK, 2013 WL 2156374, at *15 (N.D. Cal. May 17, 2013) (plaintiff "suspected that she was being discriminated against based on her race" for several years before denied promotions).

Here, there is no genuine dispute that plaintiffs Green, Strong, Hardy, Holly, Anderson, Johnson, Snell, and West believed or had reason to believe that Cliff Sullivan harbored racial animus towards African American employees well before plaintiffs first filed their administrative complaint alleging racial discrimination at C&H.  For example, sometime between 2004 and 2008, plaintiff Green complained to union business agent Lawrence Ross that he was being discriminated against on the basis of race.  Dkt. No. 164 at 42 (Green Depo., 91:1-25).  Similarly, plaintiff Strong spoke with an attorney in 2006 regarding Cliff Sullivan's racial discrimination.  Dkt. No. 164 at 77-78 (Strong Depo., 9:6-10:23).  Plaintiff Hardy stated that he began suffering emotional distress in 2008 because he felt he was passed up for a position based on his race.  Dkt. No. 164 at 53-54 (Hardy Depo., 218:3-219:7).  Plaintiff Holly testified that he believes he was discriminated against based on race because beginning more than eight years ago, he noted that Cliff Sullivan looked at him like he did not exist.  Dkt. No. 164 at 18 (Holly Depo., 26:7-27:3).  In 2008, plaintiff Anderson learned that Phil Mendelowitz heard Cliff Sullivan use the "n word" in the office.  Dkt. No. 164 (Anderson Depo., 41:8-15).  Plaintiffs Johnson and Snell similarly learned of the "n word" incident from Phil Mendelowitz sometime before his departure from C&H in March 2007.  Dkt. No. 164 at 32-33 (Johnson Depo., 165:15-166:5); Dkt. No. 164 at 89 (Snell Depo., 93:5-8).  Plaintiff West testified that he witnessed Cliff Sullivan unfairly punish and refuse to investigate grievances for African American employees.  Dkt. No. 164 at 67 (West Depo., 49:24-53:22; 90:9-91:4).  This knowledge should have been sufficient to "trigger [the] employee's awareness of and duty to assert his . . . rights" when the employees were denied promotion opportunities, which were each decisions that were

"discrete and permanent when made." *Maridon*, 2013 WL 1786592, at *11, 13. These plaintiffs therefore cannot establish a continuing violation.

But for plaintiff Thompson, a genuine issue of material fact remains as to when or if he knew or had reason to suspect that he was being denied training and promotion opportunities based on race. For example, although defendants in their reply argue that plaintiff Thompson "verbally complained to the union regarding alleged race discrimination," that claim is not supported in the record. For that proposition, defendants cite deposition testimony from Thompson stating that he "had conversation [sic] with my union about training . . . as far as people coming before me." Dkt. No. 164 at 95 (Thompson Depo., 79:18-20). That testimony does not indicate whether Thompson knew or had reason to know that his training was being denied based on his race, and the Court cannot make that inference in defendants' favor at this stage.

Therefore, because the Court finds their denied promotions had acquired a degree of permanence, alleged discriminatory acts that occurred more than one year prior to the filing of their DFEH complaints are not actionable for plaintiffs Green, Strong, Hardy, Anderson, Johnson, Snell, Holly, and West. Thus, plaintiffs Green, Strong, Hardy, Johnson, West, and Holly may not receive damages for denied trainings and promotions occurring before July 25, 2010. Plaintiffs Snell and Anderson may not receive damages for denied trainings and promotions occurring before October 7, 2010. However, for plaintiff Thompson, the denied training and promotion opportunities throughout his employment may be part of a continuing violation under FEHA and summary judgment is denied as to those opportunities occurring outside the statute of limitations period.

### ii.   Title VII and § 1981 Claims

Unlike a claim under FEHA, a plaintiff cannot recover under Title VII or § 1981 for a series of discriminatory acts that occur prior to the statutory period, even when those acts are related to timely discriminatory actions. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Lelaind v. City & Cnty. of S.F.*, 576 F. Supp. 2d 1079, 1093 (N.D. Cal. 2008) (noting that the continuing violation doctrine applies to claims under § 1981 "in the

same manner as the doctrine applies to claims pursuant to Title VII"). Under the U.S. Supreme Court's holding in *Morgan*, the continuing violations doctrine "is applicable to Title VII claims of hostile work environment, but not to claims of discrimination or retaliation."[4] *Leland*, 576 F. Supp. 2d at 1093. Discriminatory acts such as "termination, failure to promote, denial of transfer, or refusal to hire are 'discrete acts' that start a new clock for filing administrative charges alleging that act. Such discrete conduct is not actionable unless it occurs within the statutory time period." *Id.* (quoting *Morgan*, 536 U.S. at 113-14).

But the Supreme Court left open the possibility that the statute of limitations for each discrete act would not run until the employee knows or reasonably should know that the acts were discriminatory. *Morgan*, 536 U.S. at 115, n.7 (declining to decide "whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered" because employee at issue "believed that he was being discriminated against at the time that all of these acts occurred."). The Ninth Circuit has determined that the statute of limitations begins to accrue in Title VII cases when the plaintiff "knew [he] had been injured and by whom, even if at that point in time the plaintiff[] did not know of the legal injury, i.e., that there was an allegedly discriminatory motive underlying" the discriminatory act. *Lukovsky v. City & Cnty. of S.F.*, 535 F.3d 1044, 1051 (9th Cir. 2008). The Court noted, however, that the issue of accrual is separate from the issue of equitable tolling, and expressly left open the possibility that equitable tolling applies when "a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period." *Id.*; *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) ("we have held that the statutory time limits applicable to lawsuits against private employers under Title VII are subject to equitable tolling").

Several courts have tolled the statute of limitations for an employment discrimination

---

[4] The Supreme Court also expressly declined to address whether a pattern or practice claim could survive under a continuing violation theory. *Morgan*, 536 U.S. at 115 n.9. Because plaintiffs have not alleged or pointed to evidence showing a pattern or practice violation of Title VII, the Court need not address this uncertainty.

1  claim when the plaintiff could not have known that the employer's adverse decision was

2  based on discriminatory intent.  *Pronechen v. Sec'y of U.S. Dep't of Homeland Sec.*, No.

3  06-cv-01726 LEW, 2010 WL 1239318, at *2 (E.D. Cal. Mar. 25, 2010) (denying summary

4  judgment on equitable tolling issue where "for all seven positions, a material issue of fact

5  exists, as to whether Plaintiff had notice of the possibility of the alleged age

6  discrimination."); *Sterrett v. Mabus*, No. 11-cv-01899 W NLS, 2013 WL 593752, at *5

7  (S.D. Cal. Feb. 15, 2013) (finding no continuing violation under Title VII but tolling the

8  statute for discrete acts that occurred before the employee "realize[d] the employment

9  decision was the result of gender discrimination."); *see also Horita v. Kauai Island Util.*

10  *Co-op*, 352 F. App'x 194, 195 (9th Cir. 2009) (noting plaintiff could have raised equitable

11  tolling to toll the statute of limitations for her Title VII claim to the date "when Plaintiff

12  claims she first learned of discriminatory intent (and thus of her claim)").

13      Here, the same analysis regarding knowledge of discriminatory intent applies for all

14  plaintiffs as discussed with regard to plaintiffs' FEHA claims.  Therefore, Title VII and §

15  1981 claims for denied promotions outside the statute of limitations period are barred for

16  plaintiffs Green, Strong, Hardy, Anderson, Johnson, Snell, Holly, and West.  But, for

17  plaintiff Thompson, the denied training and promotion opportunities outside the statute of

18  limitations period are actionable because their statutes of limitations are equitably tolled.

19  Thompson had 300 days to file a discrimination charge from the time he first knew or

20  should have known that he may have been denied a training or promotion opportunity based

21  on race.  *See* 42 U.S.C. § 2000e-5; *Roberds v. Cnty. of Coconino*, 447 F. App'x 839 (9th

22  Cir. 2011) (charge of discrimination filed with state agency must be filed within 300 days

23  after the alleged unlawful employment practice).  Thompson had two years to file a

24  complaint pursuant to § 1981 from the time he first knew or should have known about

25  C&H's alleged discrimination.  *See Leland,* 576 F. Supp. 2d at 1092 (statute of limitations

26  begins two years prior to filing of civil complaint for § 1981 claim).

27

28

**B.    Plaintiffs' Timely Claims**

     **i.    FEHA and Title VII Discrimination Claims**

Both FEHA and Title VII prohibit employment discrimination on the basis of specified statuses, including race and national origin.  Cal. Gov't Code § 12940(a); 42 U.S.C. § 2000e.  "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying [its] own statutes."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000).

To survive summary judgment, a plaintiff may either "proceed by using the *McDonnell Douglas* framework,[5] or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]."  *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).  "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).  "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial."  *Id.*; *see also Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991) ("the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact.").

Plaintiffs have produced substantial direct evidence of discriminatory animus on the part of a supervisory employee at C&H, Cliff Sullivan.  One former employee of C&H, Phil Mendelowitz, testified that he heard Cliff Sullivan call one of the African American employees "a nigger."  Dkt. No. 79-3 at 13 (Mendelowitz Depo., 51:12-13; 52:2-5).

---

[5] When a plaintiff presents indirect proof of racial discrimination, Courts apply the burden shifting test established in *McDonnell Douglas.*  Under that analysis, the plaintiff bears the burden of establishing a prima facie case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the plaintiff succeeds, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  *Id.*  If the employer demonstrates a nondiscriminatory reason, the employee must then present evidence that the reason was pretextual.  *Id.*

1  Mendelowitz also stated that Sullivan told him "point-blank to stop it" after Mendelowitz

2  had attempted to train several African American employees. *Id.* at 13-14. He also testified

3  that Sullivan referred to one employee as "a ugly black woman." *Id.* at 35.

4      Defendants' argument that these comments merely amount to "stray remarks" is not

5  supported. Defendants rely heavily on *Merrick v. Farmers Insurance Group*, which

6  established the stray remarks doctrine in our Circuit. But in that case, the employer made a

7  single statement that he promoted a certain employee because he was "a bright, intelligent,

8  knowledgeable young man." 892 F.2d 1434, 1438 (9th Cir. 1990). Courts have since

9  explained that this remark was stray not only because it was isolated, but because it was

10  ambiguous and did not clearly demonstrate discriminatory bias. *See Coleman v. Quaker*

11  *Oats Co.*, 232 F.3d 1271, 1284 (9th Cir. 2000) (a single use of the word "promotable" was a

12  stray remark because it did not clearly demonstrate discriminatory intent based on age);

13  *Campbell v. Nat'l Passenger R.R. Corp.*, No. 05-cv-05434 CW, 2009 WL 2591611, at *4

14  (N.D. Cal. Aug. 21, 2009) ("it should go without saying that the 'young man' statement is

15  not comparable to the remarks [defendant supervisor] is alleged to have made. Three

16  witnesses testified that [defendant supervisor] used what is probably the most offensive

17  word in the English language to refer to African-Americans."); *Lewis v. Bayer Corp., Inc.*,

18  No. 03-cv-04403 JSW, 2005 WL 2893869, at *5 (N.D. Cal. Nov. 2, 2005) (finding single

19  comment that company had "a special way of dealing with minorities" was ambiguous stray

20  remark because it was "isolated and vague.").

21      There was nothing isolated, vague, ambiguous or stray about Cliff Sullivan's alleged

22  use of racial slurs to describe African American employees that he supervised. The

23  comments were overtly discriminatory, and this Court has "repeatedly held that a single

24  discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to

25  preclude summary judgment for the employer." *Dominguez-Curry*, 424 F.3d at 1039; *see*

26  *also Cordova*, 124 F.3d at 1150 (direct evidence of race discrimination where employer

27  referred to a Mexican American employee other than the plaintiff as a "dumb Mexican.");

28  *Lindahl*, 930 F.2d at 1438 (direct evidence of sexual stereotyping where employer believed

that the female candidates get "nervous" and "easily upset");  *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991) (direct evidence of sex stereotyping where employee referred to female plaintiff as "an old warhorse" and to her students as "little old ladies"); *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998) (racial slurs made by the superintendent in charge of disciplinary matters were not stray remarks, despite not being made specifically in regard to the decisionmaking process).

Defendants' reliance on *Lakes v. Chertoff* is likewise misplaced.  In that case, the only direct evidence of discriminatory intent was plaintiff's own declaration in which he stated that an employee at the company "was prone to using the N word." No. 05-cv-04874 MMC, 2008 WL 2620908, at *7 (N.D. Cal. 2008).  That case is distinguishable in several ways.  First, the employee in *Lakes* was not a decisionmaker and there was no evidence that decisionmakers had heard the employee use the "n word," or used it themselves.  There was also no evidence as to whether the word was directed at an employee, if the word was used while in the office, or when the word was used.  The use of the "n word" was also the only evidence of discriminatory motive.

Even if use of the "n word" by a decisionmaker—spoken while in the workplace, about an employee that the decisionmaker supervised—could be considered stray, it was not the only direct evidence of discriminatory intent provided by plaintiffs.  Beyond the use of the "n word," plaintiffs also presented evidence that Cliff Sullivan referred to plaintiff Crystal Coleman as "a ugly black woman."  Dkt. No. 79-3 at 16, 35 (Mendelowitz Depo., 52:21-22; 218:10-11).  In reference to another African American employee, who Coleman kissed on the cheek on his last day of work, Sullivan allegedly commented, "[o]h, god, that's gross.  How could you kiss something like that?"  *Id.*  Another plaintiff testified that he witnessed Sullivan unfairly discipline African American employees, refuse to investigate grievances from African American employees, and that Sullivan did not speak or shake hands with African American employees.  Dkt. No. 164 at 67 (West Depo., 72:2-7; 49:24-53:22; 35:4-25; 85:8-86:2; 90:9-91:4).  Phil Mendelowitz also testified that Sullivan

reprimanded him when he attempted to train African American employees.  Dkt. No. 79-3 at 13 (Mendelowitz Depo., 49:17-50:12).

Defendants will have an opportunity at trial to challenge the credibility or truth of this evidence of Sullivan's racial bias against African American employees, but for now, it creates a triable issue of fact as to plaintiffs' race discrimination claims.  *See Dominguez-Curry,* 424 F.3d at 1039 (direct evidence of discriminatory intent created triable issue even where no date range was given for the comments, because "[w]hile a factfinder is free to conclude at trial that the plaintiff's account is insufficiently detailed to be believable, the district court must refrain from making such credibility assessments on summary judgment.").

Because plaintiffs' direct evidence alone is sufficient to preclude summary judgment, the Court need not engage in the *McDonnell Douglas* burden shifting analysis.  *Metoyer,* 504 F.3d at 931.  This precedent is logical, as no amount of evidence of a legitimate nondiscriminatory motivation would be sufficient to eliminate the dispute of material fact created by direct evidence of the employer's discrimination.

### ii.   Section 1981 Claims

Section 1981 of the Civil Rights Act provides that every person in the United States "shall have the same right in every State and Territory to make and enforce contracts" regardless of race.  42 U.S.C. § 1981(a).  "The term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  This Court has thus found that § 1981 protects not only "the initiation of the employment relationship but also subsequent modifications during the course of the employment relationship such as promotion."  *Lukovsky,* 2006 WL 436142, at *3.

In determining whether an employer's act is a violation of § 1981, courts apply "the same legal principles as those applicable in a Title VII disparate treatment case."  *Metoyer,* 504 F.3d at 930.  Because the Court finds that plaintiffs have presented evidence sufficient

1    to create a genuine issue of material fact as to their timely race discrimination claims,

2    plaintiffs' § 1981 claims also survive summary judgment.

3           **iii.**    **Failure to Prevent Discrimination Claims**

4          It is an unlawful employment practice under FEHA "for an employer . . . to fail to

5    take all reasonable steps necessary to prevent discrimination and harassment from

6    occurring" in the workplace.  Cal. Govt. Code § 12940(k).  A plaintiff seeking to recover

7    damages based on a claim of failure to prevent discrimination or harassment "must show

8    three essential elements: 1) plaintiff was subjected to discrimination, harassment or

9    retaliation; 2) defendant failed to take all reasonable steps to prevent discrimination,

10   harassment or retaliation; and 3) this failure caused plaintiff to suffer injury, damage, loss or

11   harm."  *Leland*, 576 F. Supp. 2d at 1103.

12         In moving for summary judgment on plaintiffs' failure to prevent discrimination

13   claims, defendants rely solely on the argument that there can be no liability for a failure to

14   prevent discrimination claim where the underlying FEHA discrimination claim is dismissed.

15   *See Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 288-89 (1998).  Because the

16   Court finds that plaintiffs' timely FEHA claims survive, summary judgment is also denied

17   as to their failure to prevent discrimination claims.  *See Guitron v. Wells Fargo Bank, N.A.*,

18   No. 10-cv-03461 CW, 2012 WL 2708517 (N.D. Cal. July 6, 2012) (denying motion for

19   summary judgment as to failure to prevent age discrimination claim, where underlying age

20   discrimination claim survived summary judgment).

21   **C.**   **Plaintiffs' Damages**

22         Defendants argue that because only one plaintiff could have received each

23   promotion, only one plaintiff can be awarded damages for each promotion.  Based on this,

24   defendants argue that plaintiffs' damages are too speculative and the Court should award

25   summary judgment.  The Court disagrees.  The only case that defendants rely upon, *Arnold*

26   *v. U.S. Department of Interior*, is a case from the Fifth Circuit, which is not binding on this

27   Court.  213 F.3d 193 (5th Cir. 2000).  No Ninth Circuit opinion or District Court in our

28   Circuit has relied upon or cited to *Arnold*.  Regardless, the Court finds that the issue of

apportioning damages is premature and not a reason to award summary judgment in defendants' favor.  By defendants' own logic, if plaintiffs prove their case at trial, at least one plaintiff can receive damages for each denied promotion.

## CONCLUSION

For the reasons explained, defendants' motion for summary judgment is granted in part and denied in part.  The Court grants summary judgment as to the FEHA, Title VII, and § 1981 claims for promotions outside the statute of limitations period for plaintiffs Green, Strong, Hardy, Anderson, Johnson, Snell, Holly, and West.  The claims outside the statute of limitations period for plaintiff Thompson survive summary judgment.  The Court denies the motion for summary judgment as to all plaintiffs' timely claims.  The Court denies the motion for summary judgment based on the theory that plaintiffs' damages are too speculative.

Within seven days of this order, the parties must jointly submit a chart setting forth which promotions remain actionable under Title VII, FEHA, and § 1981 for each plaintiff, based on this order and the Court's prior order denying summary judgment as to plaintiff Crystal Coleman.  If after meeting and conferring in an attempt jointly create a chart the parties cannot agree on the promotions still at issue, the parties must submit competing proposed charts and a letter brief explaining the disagreement, within seven days of this order.  In addition, the parties must meet and confer to discuss whether they wish to sever certain plaintiffs or claims for purposes of trial.  The parties must submit either a stipulation or a joint letter brief, within seven days of this order, explaining their positions on severance.


IT IS SO ORDERED.

Date:  May 5, 2014

_____
Nathanael M. Cousins
United States Magistrate Judge